# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LINDA A. MORAN,                              )
                                             )
                   Claimant,                 )       No. 15-cv-4027
                                             )
            v.                               )       Jeffrey T. Gilbert
                                             )       Magistrate Judge
NANCY A. BERRYHILL,[1] Acting                )
Commissioner of Social Security,             )
                                             )
                   Respondent.               )

## MEMORANDUM OPINION AND ORDER

Claimant Linda Moran ("Claimant") seeks review of the final decision of Respondent Nancy A. Berryhill, the Acting Commissioner of Social Security ("the Commissioner"), denying Claimant's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. Pursuant to 28 U.S.C. §636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 6]. The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. [ECF Nos. 19, 23]. For the reasons stated below, the Commissioner's motion is granted and Claimant's motion is denied. The decision of the Commissioner is affirmed.

## I. PROCEDURAL HISTORY

In July, 2008, Claimant filed applications for DIB and SSI alleging a disability onset date of June 1, 2007. (R. 121-127). After these applications were denied initially and upon

---

[1] On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Colvin is automatically substituted as the Defendant in this case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

reconsideration (R. 45-48), Claimant filed a request for an administrative hearing, (R. 76-77). At a hearing held on September 24, 2009, Claimant, who was represented by counsel, and a vocational expert testified. (R. 10-44). Ultimately, the ALJ denied Claimant's applications, finding she was not disabled under the Act. (R. 52-60). The Appeals Council denied Claimant's subsequent request to review that decision. (R. 1-6).

Claimant then challenged the ALJ's determination in the United States District Court for the Northern District of Illinois. *Moran v. Astrue*, 2013 WL 53893 (N.D. Ill. Jan 3, 2013). Judge Valdez ruled the ALJ erred in assessing Claimant's credibility because she relied on boilerplate language, did not address Claimant's testimony regarding lotion usage and exposure to cold and hot temperatures, did not explain why Claimant's daily activities were inconsistent with her testimony, and improperly relied on the absence of objective medical evidence and Claimant's desire to return to work. *Id.* at *7-8. Judge Valdez found the ALJ further erred by neither discussing whether Claimant's hand and foot limitations were consistent with the medical evidence nor explaining why those limitations were not incorporated into the RFC. *Id.* at *9. Although Judge Valdez remanded the case because of these errors, she also rejected some of Claimant's arguments. Judge Valdez determined the ALJ did not err in her consideration of Claimant's obesity, despite minimal discussion of the impairment, because, in light of the evidence in the record, Claimant did not show further discussion would have changed the ALJ's decision. *Id.* Judge Valdez also held substantial evidence supported the ALJ's finding that Claimant's depression did not affect her functional capacity. *Id.*

The ALJ held another hearing on October 31, 2013. (R. 361-406). Again, Claimant, represented by counsel, appeared and testified. *Id.* A vocational expert ("the VE") and a medical expert, Dr. Ronald Semerdjian ("Dr. Semerdjian"), also testified. *Id.* On November 21,

2013, the ALJ again denied Claimant's applications. (R. 308-321). The ALJ's decision followed the five-step sequential evaluation process required by Social Security Regulations. *Id.* At step one, the ALJ found Claimant had not engaged in substantial gainful activity since her alleged onset date. (R. 311). At step two, the ALJ found Claimant had the severe impairments of congenital lamellar ichthyosis, and, since February, 2011, low back pain/degenerative disk disease. *Id.* At step three, the ALJ found Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 505.1526, 416.920(d), 416.925 and 416.926). (R. 313).

Before step four, the ALJ found Claimant had the residual functional capacity ("RFC") to perform light work. (R. 314). The ALJ limited Claimant, though, to work that involved no more than occasional bilateral grasping and fine manipulation with her hands, and occasional bending, stooping, crawling, and climbing of ladders, ropes, or scaffolds. *Id.* The ALJ further found Claimant must avoid concentrated exposure to open heights, moving and hazardous machinery, and heat. *Id.* Based on this RFC, the ALJ found, at step four, Claimant was unable to perform any past relevant work. (R. 320). At step five, the ALJ concluded there were jobs that existed in significant numbers in the national economy that Claimant could perform. *Id.* Specifically, the ALJ found Claimant could work as an information clerk, an usher, and a locker room attendant. (R. 321).

When the Appeals Council denied Claimant's request for review, the ALJ's denial became the final decision of the Commissioner. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Claimant now seeks review in this Court pursuant to 42 U.S.C. § 405(g). *See Haynes v. Baumhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). A claimant then may seek review of this final decision in the district court. *Id.* Judicial review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the district court will not uphold the ALJ's findings if the ALJ did not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the substantial evidence standard is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). The court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## III. ANALYSIS

Claimant asserts the ALJ made four errors in her decision. First, Claimant argues the ALJ improperly assessed Claimant's mental impairments and the limitations caused by those impairments. Second, Claimant contends the ALJ did not adequately account for Claimant's obesity. Third, Claimant maintains the ALJ erred in assessing her credibility. Fourth, Claimant claims the ALJ relied on the VE's flawed testimony at step five. The Court finds the ALJ did not commit any of these errors.

### 1. The ALJ Developed A Full And Fair Record And Adequately Incorporated Claimant's Mental Impairments Into Her RFC

Claimant raises two arguments related to the ALJ's evaluation of her mental impairments. The first is that the ALJ "had no medical evidence whatsoever to guide her in evaluating the severity of [Claimant's] mental impairments." [ECF No. 25], at 4. According to Claimant, the ALJ "should have recognized that she needed additional evidence" to apply the special technique. *Id.* Specifically, Claimant contends the ALJ either should have requested Claimant undergo a psychological examination or submitted her health records to a medical expert who was trained in psychiatry of psychology. [ECF No. 19], at 10. Claimant asserts that, because the ALJ did not have an opinion from a mental health specialist, the ALJ relied on "her own lay speculation" to determine the severity of Claimant's mental impairments. *Id.*

When this case was before Judge Valdez in 2013, Claimant asserted a different but related argument. Claimant contended "the ALJ improperly rendered her own independent medical assessment" of Claimant's depression and, as a result, impermissibly discounted the seriousness of those impairments. *Moran*, 2013 WL 53893, at *9. Judge Valdez rejected Claimant's position. Judge Valdez noted the record contained two GAF scores, an RFC completed by a medical professional that "made no mention of emotional limitations," and the

records of another doctor who found Claimant to be emotionally stable. *Id.* Judge Valdez held "[t]he inconsistences of the GAF scores and the diagnoses, combined with the ALJ's review of several of Moran's mental health assessments, are sufficient to meet the standard for 'substantial evidence.'" *Id.* The Court recognizes, of course, that the record and the parties' arguments were different in the case before Judge Valdez and provides this summary merely as background.

An ALJ has a duty to develop a full and fair record. *Martin v. Astrue*, 345 F. App'x 197, 201 (7th Cir. 2009). Because of this duty, an ALJ must ensure the record contains enough information to assess a claimant's RFC and make a disability determination. *Id.* "Failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). But courts generally uphold the Commissioner's judgment about how much evidence to gather. *Nelms*, 553 F.3d at 1099. Remand is appropriate only where an ALJ's decision not to gather evidence either prejudiced the claimant or left an evidentiary gap. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). That resulting prejudice or gap generally must be significant. *Giebudowski v. Colvin*, 981 F. Supp. 2d 765, 775 (N.D. Ill. 2013). To carry her burden, a claimant must identify what specific, relevant facts an ALJ did not to consider. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1143 (N.D. Ill. 2012).

Contrary to Claimant's description, the record in this case contains meaningful objective medical evidence related to Claimant's mental impairments and limitations, and this evidence was considered by the ALJ. The ALJ discussed an August 2008 mental status examination conducted by Dr. Scott Kale that did not reveal any mental problems. (R. 243, 311). The ALJ characterized Dr. Kale as finding Claimant to be "stable from . . . [an] emotional point of view." (R. 317). That description is an accurate portrayal of Dr. Kale's report. (R. 243). The ALJ also cited to records from a March 2009 preliminary mental health services assessment and an April

2009 counseling session. (R. 311). During the preliminary assessment, Claimant reported feeling depressed and was found to have some functional impairments. (R. 259-260). A report from the April session reveals Claimant was diagnosed with major depressive disorder. (R. 269). But the report also said Claimant had normal insight, judgment, memory, thought content, intellectual ability, mood, and attitude. (R. 267). During the April session, as the ALJ noted, Claimant was assigned a GAF score of 54 (R. 270), which is within the "range of scores which reflect only moderate symptoms or moderate difficulty in social, occupational, or school functioning," *Eisaman v. Astrue*, 2012 WL 3028040, at *8 (N.D. Ind. July 24, 2012).

The ALJ also discussed psychiatric progress notes from January, March, and April of 2012, all relating to sessions with Dr. Robert Grunstein. The January note reports Claimant said she was no longer depressed and Dr. Grunstein concluded, after his mental status exam, Claimant was well-oriented and did not exhibit any signs of psychotic thinking. (R. 583). Dr. Grunstein diagnosed Claimant with a form of ADHD, Combined Type, but not with depression. *Id.* In March, Dr. Grunstein again said Claimant was well-oriented, with no signs of psychotic thinking. (R. 582). He made the same ADHD diagnosis and again did not diagnosis Claimant with depression. *Id.* Then, in April, the doctor noted Claimant "had some anxiety" but made largely the same findings and the same diagnoses. (R. 581). There were additional medical records regarding Claimant's mental condition in the record that the ALJ did not discuss or cite. *See, e.g.*, (R. 286-289, psychiatric notes from July and September 2009); (R. 584-597, a Clinical Assessment from December 2011 reporting a GAF score of 55 and largely normal findings).

Claimant contends the Court must ignore all of the mental health records discussed by the ALJ because the ALJ "did not consider" them when applying the special technique. [ECF No. 25], at 4. The special technique is used by an ALJ to assess the severity of mental impairments

for adults. *Trexler v. Colvin*, 2014 WL 2700019, at *6 (S.D. Ill. June 13, 2014). The first step in the special technique is to determine whether a claimant has a medically determinable mental impairment. *Hart v. Colvin*, 2015 WL 5278793, at *8 (N.D. Ill. Sept. 9, 2015). Then, the ALJ must analyze how any impairment limits the claimant in four functional areas: daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* Based on her application of the special technique, an ALJ then determines whether any of the claimant's impairments is severe or meets a listing. *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013).

In this case, the ALJ did not cite the above-discussed medical records in the few paragraphs where she discussed each of the four functional areas. (R. 312). But the page that immediately preceded those paragraphs, which was part of the special technique section of her ruling devoted to determining the severity of Claimant's impairments, focused almost entirely on the objective medical evidence of Claimant's mental impairments. (R. 311). The ALJ explicitly framed her assessment of that evidence as relating to the "limitations on [Claimant's] ability to function." *Id.* Further, after discussing each functional area, the ALJ said the RFC analysis, provided in a subsequent portion of the ruling, contained a more detailed assessment of the evidence of Claimant's abilities but still "reflect[ed] the degree of limitation" found in the functional analysis. (R. 313). Although the ALJ's failure to repeat her assessment of the objective medical evidence in the few paragraphs related to the four functional areas may have made her ruling somewhat less clear, the Court cannot ignore large portions of the ALJ's opinion that analyze objective medical evidence when those portions either appear in the special technique section of her ruling or are referenced in that section.[2]

---

[2] Even if the Court were to adopt Claimant's artificially cramped reading, remand still would not be justified. As the Seventh Circuit has held, the failure to explicitly use the special technique may be harmless when an ALJ "provided enough information to support the 'not severe' finding" and that finding was supported by substantial medical evidence. *Pepper*, 712 F.3d at 366; *see also Santore v. Astrue*,

An ALJ's decision must be read as a whole and with common sense. *Tucker v. Comm'r of Soc. Sec.*, 2016 WL 3264354, at *10 (C.D. Ill. June 14, 2016). An ALJ "need not repeat his discussion of medical evidence in each section of the decision where it may be relevant." *Antonakis v. Colvin*, 2016 WL 1175128, at *4 (E.D. Wis. Mar. 25, 2016). Where an ALJ discusses objective medical evidence at one step and references that discussion at another step, courts cannot "discount it simply because it appears elsewhere in the decision." *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). "To require [an] ALJ to repeat such a discussion throughout his decision would be redundant." *Id.*

The record also contained the extensive testimony of Dr. Semerdjian, a medical expert, which the ALJ discussed at length throughout her opinion. Dr. Semerdjian testified there was "sufficient information and objective evidence, both in the file and through the testimony [at the hearing], for [him] to render an opinion as to what impairments" Claimant had. (R. 388-389). He explained the record contained "some psychiatric entries," but those "are relatively limited." (R. 389). He noted Claimant's doctors, at one time, were "speaking of bipolarity versus depression," but bipolarity is not "strongly supported in the record," there is not "good evidence for [bipolarity]," and there was no significant therapy directed at a bipolar disorder at any time. (R. 391); *see also* (R. 392). Dr. Semerdjian said there was "some evidence" of Claimant's depression. (R. 391). He only characterized her depression as a "[d]epressive disorder" and did not provide a more specific diagnosis. (R. 392) (". . . I think [that] is the way I'd leave it because that's as far as I should . . ." go.). Dr. Semerdjian concluded that Claimant's "major psychiatric

2015 WL 1917163, at *7 (N.D. Ill. Apr. 28, 2015) ("Harmless error may also arise where, even if 'the ALJ did not make explicit findings referencing the four functional areas,' it is apparent from 'a plain reading of the ALJ's written decision' that 'the ALJ considered all the relevant information and factors required.'") (quoting *Pepper*, 712 F.3d at 366). In this case, the ALJ's ruling, consistent with the record, provided enough information to support the ALJ's conclusion that Claimant's mental limitations were not severe, that determination is supported by substantial medical evidence, and the ALJ adequately accounted for Claimant's mental limitations in Claimant's RFC.

issue" was her ADHD. (R. 396); *see also* (R. 391). He noted, though, that ADHD "varies in severity" and Claimant "seems pretty well compensated here. So I don't think there would be significant limitation in that area." (R. 396). Ultimately, Dr. Semerdjian opined Claimant's mental impairments would not cause any limitations in her ability to work. (R. 397); *see also* (R. 396). The ALJ gave Dr. Semerdjian's opinion significant weight. (R. 319).

Claimant contends Dr. Semerdjian's opinion regarding Claimant's mental impairments has little to no value because he was a specialist in internal medicine and pulmonary diseases, rather than a specialist in mental health. The Social Security Regulations do provide that, generally, more weight should be given to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). But the regulations do not mandate that a doctor's opinion be given no weight unless it relates to an area of medicine in which he or she is a specialist. To the contrary, specialization is only one of the enumerated factors ALJs consider when evaluating opinion evidence. 20 C.F.R. § 404.1527(c).

Claimant cites no case, medical source, or other authority indicating an internist is incapable of rendering any medical assessment of an individual's mental condition. Claimant does not make even a minimal showing that Dr. Semerdjian's opinion is contrary to the objective medical evidence in the record or other opinion evidence. And Claimant does not explain what unique or complex aspect of her mental condition rendered a specialist necessary despite all of the other evidence in the record.

The Court finds it noteworthy that Dr. Semerdjian used his medical judgment to decide whether he could assess Claimant's mental condition. He said he believed there was "sufficient information and objective evidence . . . for [him] to render an opinion as to what impairments"

Claimant had. (R. 389). When the ALJ asked Dr. Semerdjian if he could identify any

psychiatric impairments, the doctor did not say he lacked the medical training and expertise to do

so, but, rather, proceeded to provide the above discussed testimony. (R. 391). Dr. Semerdjian

was conscious of his limitations, though, and refused to provide a more specific diagnosis of

Claimant's depressive disorder. (R. 392-393).[3] Claimant's unsupported and speculative

assertion that Dr. Semerdjian was incapable of assessing Claimant's mental impairments is not

enough to justify setting aside Dr. Semerdjian's and the ALJ's conclusions to the contrary. *See*

*Griffo v. Colvin*, 2015 WL 8179941, at *3-4 (N.D. Ill. Dec. 7, 2015) (finding an ALJ erred by

rejecting a medical professional's assessment that he had the necessary information to render an

opinion).

      Claimant's argument suffers from one more defect. Claimant never explains what a

mental health specialist would say that might make the record more full and fair. In fact,

although it is implied in her argument, Claimant never even contends a specialist's opinion

would (or might) include more significant limitations than either Dr. Semerdjian's opinion or the

RFC crafted by the ALJ. The Court appreciates that Claimant cannot know what a mental health

specialist would say before he or she has rendered an opinion. But Claimant does not identify

objective medical evidence in the current record that would support a more limited mental RFC.[4]

"'Mere conjecture or speculation that additional evidence might have been obtained in [a]case is

insufficient to warrant a remand.'" *Orienti v. Astrue*, 958 F. Supp. 2d 961, 974 (N.D. Ill. 2013)

(quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir.1994)).

---

[3] Claimant does not argue Dr. Semerdjian improperly identified Claimant as having a depressive disorder or his inability to provide a more specific diagnosis undermined the ALJ's disability determination.

[4] The Court notes that there is at least some such evidence in the record. *See, e.g.,* R. 260 (GAF score of 50); R. 267 (reporting "difficulties with concentration"); R. 269 (diagnosing Claimant with Major Depressive Disorder, Recurrent, Mod.); R. 584 (noting several depressive issues, including depressed mood).

As the discussion above illustrates, the ALJ did not rely on lay speculation when applying the special technique and assessing Claimant's mental impairments. The record contained, and the ALJ discussed, mental health records and a medical opinion assessing Claimant's mental impairments. Although this evidence was somewhat mixed, it is the ALJ's job to weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). What matters for the purpose of addressing Claimant's present argument is that the record contained "enough information to assess [C]laimant's RFC and to make a disability determination." *Martin v. Astrue*, 345 F. App'x 197, 201 (7th Cir. 2009). Of course, a record is never perfectly complete. *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993). And Claimant, who was represented by counsel, does not provide an adequate justification for setting aside the reasoned judgment of the Commissioner as to how much evidence to gather. *See Nelms*, 553 F.3d at 1098 (explaining courts generally uphold that judgment); *see also Swanson v. Apfel*, 2000 WL 1206587, at *7 (S.D. Ind. Aug. 7, 2000) ("When a claimant is represented by counsel, the ALJ is entitled to assume she is making her best case.").

Claimant's second argument related to her mental impairments is that her RFC did not adequately incorporate the mild limitations in (1) concertation, persistence, or pace, and (2) social functioning, which the ALJ found she had. [ECF No. 19], at 11.

"When assessing a claimant's RFC, the ALJ must consider all limitations that arise from medical impairments, regardless of the severity of the limitation." *Lorenzo v. Astrue*, 2013 WL 3337794, at *11 (N.D. Ill. July 2, 2013). In this case, the ALJ considered Claimant's mental condition, including all of her mental impairments, when constructing the RFC. As stated above, the ALJ found Claimant's mental impairments—which caused the mild limitations in concentration, persistence, or pace and in social functioning—were "non-severe." (R. 313).

12

That means she found they did not "significantly limit [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). This fact is further confirmed by statements in the ALJ's RFC analysis. For instance, the ALJ said in that section of her ruling that Claimant's non-treatment "supports a finding that her ADHD symptoms do not cause significant limitations upon her ability to concentrate." (R. 315). Ultimately, the ALJ determined a limitation to unskilled work was sufficient to account for any mental limitations and no further work-related limitation, including one regarding social functioning, was needed.[5]

Claimant has failed to show this decision is not supported by substantial evidence. Claimant does not cite any evidence indicating the extent to which the two mild limitations affected her ability to do work and required an additional limitation in the RFC. In fact, she does not even identify a limitation she believes the evidence merited (e.g. simple instructions, 2-step tasks, limited interactions with the public).

Instead, Claimant only asserts the ALJ failed to adequately explain why such limitations were not required. As Claimant argues, the RFC crafted by the ALJ may not account in every case for mild limitations in concentration, persistence, or pace, and social functioning. But a restriction to unskilled work is not always insufficient to account for such mild limitations. *See Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010); *Applewhite v. Colvin*, 54 F. Supp. 3d 945, 954 (N.D. Ill. 2014). While the ALJ did not explain in depth how the RFC accommodated these limitations, the Court finds that her ruling, read as a whole, provides enough information to conduct a meaningful review of her conclusion that no additional work-related limitation was required.

---

[5] The Commissioner says the ALJ limited Claimant to unskilled work. [ECF No. 24], at 7. Claimant does not dispute this fact, but, instead, argues the limitation to unskilled work did not suffice to account for her mild limitations. [ECF No. 25], at 6. The ALJ's ruling did not list the restriction to unskilled work in Claimant's RFC. Because neither party argues the failure to specifically note that limitation in the ruling either was an error in itself or caused another error, the Court merely notes this fact.

## 2. The ALJ Adequately Accounted For Claimant's Obesity

Claimant argues the ALJ did not consider whether Claimant's obesity aggravated her other impairments. The ALJ recognized Claimant's body mass index of 33.9% placed her in the lowest level of obesity, Level I, pursuant to SSR 02-1p, and discussed her efforts to lose weight. (R. 311, 315). The ALJ noted Claimant "has not alleged any physical limitations due to her obesity." (R. 312). But the ALJ said she still considered Claimant's obesity in assessing Claimant's limitations. (R. 311). The ALJ recognized Claimant's obesity could have a greater effect when combined with Claimant's other conditions. (R. 312). And she discussed evidence related to Claimant's back pain and degenerative disc disease. *See, e.g.*, (R 317-318). Ultimately, the ALJ found Claimant did not present any evidence showing her obesity was a severe impairment "alone *or in combination with another medically determinable impairment*." (R. 312) (emphasis added).

A claimant bears the burden of proving, through evidence, she has an impairment and the impairment limits her ability to work. *See Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."). With respect to obesity, a claimant "must articulate how her obesity limits her functioning and exacerbates her impairments." *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007). A claimant does not satisfy this burden by suggesting her obesity "generally exacerbates her impairments," without explaining how the condition actually affects her ability to work. *Id.*; *see also Stephens v. Colvin*, 2016 WL 1271050, at *7-8 (N.D. Ill. Mar. 29, 2016), *aff'd*, 2016 WL 7228705 (7th Cir. Dec. 13, 2016).

Yet, just as in front of the ALJ, Claimant does not provide evidence showing her obesity, separately or in combination, causes more severe limitations than those in the RFC. Instead,

Claimant simply says she had low back pain and degenerative disk disease, which potentially could be made worse by obesity. Speculation about the hypothetical effect of her obesity, unsupported by either explanation or evidence, is not enough to justify remand. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk.").

Claimant asserts that, regardless of whether the RFC accounted for her obesity, the ALJ's ruling did not explain her decision thoroughly enough with respect to that condition. As stated above, the ALJ mentioned Claimant's obesity and provided at least some minimal discussion of it. But even if the ALJ did not say enough about Claimant's obesity—which is a finding that the Court is not making—, that error would be harmless. *See Hisle*, 258 F. App'x at 37 ("This Court has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity."). Where an ALJ adopts limitations suggested by a doctor who was aware of or discussed claimant's obesity, a reviewing court can conclude the ALJ implicitly considered the obesity. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012); *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In this case, the ALJ gave significant weight to the opinion of Dr. Semerdjian, who listened to Claimant's testimony and reviewed the medical evidence in the record, which discusses Claimant's obesity. There cannot be any real doubt that Dr. Semerdjian considered Claimant's obesity. Dr. Semerdjian also testified about the conditions Claimant contends might be impacted by her obesity. (R. 389-390). Claimant does not argue Dr. Semerdjian is unqualified to assess the effects of her obesity or to opine as to her

physical abilities. And the restrictions incorporated into the RFC by the ALJ did not reflect a greater ability to work than did those recommended by Dr. Semerdjian.

For all of these reasons, the Court finds the ALJ's assessment of Claimant's obesity does not justify remand.

### 3. The ALJ's Assessment Of Claimant's Credibility Was Not Patently Wrong

Claimant contends the ALJ erred in evaluating his credibility. A reviewing court will not overturn an ALJ's "credibility determination unless it is 'patently wrong.'" *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). A credibility determination is patently wrong when it "lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The patently wrong standard is "extremely deferential" to an ALJ's credibility determination. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

Claimant argues the ALJ erred by using boilerplate language. In this case, the ALJ repeated some general boilerplate language at the beginning of her credibility analysis, as most ALJs do in most cases. (R. 314). But the ALJ did not stop there. Instead, the ALJ went on to analyze in detail both what Claimant said at the hearing and whether her testimony was credible. (R. 314-317, 319). The mere fact that an "ALJ 'used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [she] otherwise points to information that justifies [her] credibility determination.'" *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), *as amended* (Aug. 20, 2014) (quoting *Pepper*, 712 F.3d at 367-68). Therefore, Claimant's first argument is of no avail.

Claimant next contends the ALJ did not specify which statements from her testimony were credible and which were not. The Court disagrees. The ALJ, after describing particular

parts of Claimant's testimony, then identified evidence she found contradicted that testimony. A fair reading of the ALJ's ruling indicates she specifically discredited Claimant's testimony about, for example, the extent and limiting effects of the cracking, bleeding, and splitting of her hands and feet; the severity of her pain; her ability to grasp; and the limiting effect of her use of lotion. (R. 315). This conclusion about the ALJ's ruling is confirmed by Claimant's own arguments. For instance, Claimant criticizes the ALJ for rejecting Claimant's "allegations regarding her use of moisturizers and lotions to ameliorate the dryness of her skin." [ECF No. 19], at 15. Claimant also argues the ALJ "failed to explain" why she discredited Claimant's "allegations that she suffered from split skin on her feet and split skin and swelling in the fingers. *Id.* at 13-14. By arguing the ALJ found that Claimant's testimony in these areas was not credible, Claimant implicitly acknowledges the ALJ assessed her credibility and identified certain statements that were not credible.

Claimant also challenges a handful of the ALJ's specific findings with respect to her credibility determination. Claimant argues the ALJ erred by relying on her conservative treatment to undercut her testimony about the limiting effects of her conditions. According to Claimant, the ALJ insufficiently inquired into Claimant's ability to pay for care, and failed to account for the fact that Claimant was unable to afford certain treatments. At the hearing, Claimant told the ALJ she was not earning an income, was not receiving the child support payments due to her, was on food stamps, and was on public aid. (R. 368, 374). In her ruling, the ALJ acknowledged Claimant's limited funds and the fact that she was on public aid. (R. 316). Therefore, the ALJ inquired into and was aware of Claimant's limited resources.

Moreover, the ALJ's analysis of Claimant's undisputedly conservative treatment focused on Claimant's failure to take medications to which she had access and her doctors' conservative

treatment recommendations. The ALJ described how Claimant skipped doses of psychotropic medication, even when she had access to it. (R. 311, 315, 317). Claimant said that she only took Wellbutrin, which she had a year's supply of, between zero and two times a week, depending on whether she was frustrated or agitated. (R. 372). The ALJ repeatedly said the record did not contain any recommendations from Claimant's doctors that she shower four to six times a day, apply lotion six times a day, or undergo any treatment for her ichthyosis beyond applying moisturizing lotions, skin cream, and scalp oil. (R. 313, 317, 318, 319). The ALJ recognized that Claimant's doctors did not recommend physical therapy or injections for her back condition. (R. 315). Claimant's inability to afford care does not impact how probative any of these facts are of the credibility of the relevant portions of her testimony about the extent of her impairments and the resulting limitations.

Further, with relation to Claimant's back pain, hernia, and psychiatric treatment, the record indicates that her lack of funds was not the cause of her conservative treatment. As the ALJ stated, Claimant's doctors said they would refer her to a back specialist. (R. 315, 373-374). Claimant testified that her doctors said they would find a specialist who accepted public aid. (R. 374). But Claimant testified she only called them once after the recommendation and they "had no idea what [she] was talking about." *Id.* There is no indication that an inability to afford care was preventing Claimant from pressing the matter further. Relatedly, Claimant testified her doctors recommended a hernia repair but she had not yet had undergone that procedure because she needed to arrange for child care. *Id.* Claimant said she was going to try to find someone to watch her son and that her son's father could watch him. *Id.* Again, neither money nor any other significant hurdle appears to have kept Claimant from seeking the recommended treatment. Finally, Claimant testified that she is no longer seeing a psychiatrist "because of her own

18

stupidity." (R. 371). According to Claimant, when she last went to see a mental health professional, the doctor was running so late that she had to leave to care for her son. *Id.* But Claimant's decision not to try to schedule another appointment does not appear to have anything to do with lack of funds.

The ALJ also described how, from 2008 onward, Claimant sought care for a whole host of issues, such as childbirth, a urinary tract infection, and hernia pain. (R. 319). The ALJ recognized, though, that Claimant did not seek out consistent treatment for other conditions, such as her skin disorder, and did not even raise concerns about her skin disorder when she went to the hospital. (R. 317, 319).

In light of all of these facts, the Court finds the ALJ's decision to discount the credibility of Claimant's statements about her impairments and their limiting effects, particular in relation to her skin condition, because of her conservative treatment was not patently wrong. Although the ALJ, at times, potentially drew negative credibility inferences based on certain treatments the record did not establish that Claimant could afford, the majority of the ALJ's conservative treatment analysis did not fall prey to that failing.

Claimant next argues the ALJ incorrectly concluded Claimant would not need breaks during the workday to apply lotion by discrediting her testimony related to lotion usage. Claimant testified she uses therapeutic moisturizing cream from Wal-Mart to keep her skin hydrated. (R. 375). Claimant said she puts this lotion on "at least six to eight times a day, sometimes more." (R. 383). Most of these applications were due to the fact Claimant took baths four to six times a day because her skin dried out. (R. 375). Claimant testified showering dried her skin out more, but it "also . . . puts moisture back into my skin, so the, so the moisturizing cream can hold the moisture in it." *Id.* Claimant believed she had to put lotion on after each

shower. (R. 375, 383). Claimant said each application of lotion could take up to 30 minutes but, if she dried herself off completely with a towel, she could apply the lotion within about 10 minutes. (R. 383).

The ALJ found Claimant's testimony overstated her need to shower and to apply lotion. Claimant testified a dermatologist told her at a conference that she had to take baths throughout the day. (R. 375-376). According to Claimant, the dermatologist never treated her, but, rather, only spoke with her at a conference. (R. 383). As the ALJ noted, however, all of the other medical professionals who recommended treatment for Claimant's condition did not say she needed to shower. Claimant's other doctors prescribed lotions, creams, and scalp oil. (R. 317). But the record does not contain any other recommendation that Claimant shower four to six times each day. *See* (R. 375, 390). The medical professionals, other than the dermatologist at the conference, did not recommend any "other specific therapeutic advice . . . to the claimant regarding treating her ichthyosis." (R. 318). Relatedly, Dr. Semerdjian testified he did not see "any reference in the file or the objective medical evidence to a need or a recommendation to apply lotion six, eight times a day for two hours." (R. 404). In light of the fact that none of Claimant's treating doctors recommend that she shower four to six times each day, the ALJ was not patently wrong to conclude that Claimant's testimony that she needed to do so was not credible.

The ALJ also found that Claimant's testimony that she could not work because of the demands imposed by her lotion routine was not credible because of her past work. Claimant worked as a bus driver, from 1992 through 2006 (R. 156), and, in 2009, the same year Claimant talked to the dermatologist, as a seasonal deliverer of packages for UPS. (R. 315-316). As both Dr. Semerdjian and the ALJ noted, Claimant did not leave her previous work because she was

physically unable to perform the required tasks. (R. 316, 400). The ALJ was not wrong to conclude that Claimant's ability to accommodate her lotion routine while she performed these jobs indicates that her need to apply lotion did not keep her from working.[6] And, while Claimant testified her condition had worsened since 2009, (R. 316), the ALJ found "[t]here is no indication that her condition has worsened since that time." (R. 319). Claimant does not try to dispute this finding and, thus, Claimant's past work provides another sound basis for discounting her testimony about lotion usage.

The ALJ also noted (R. 316) that Judge Valdez, when remanding Claimant's case, found Claimant "overstate[d] the potential impact of the lotion issue on her RFC," *Moran*, 2013 WL 53893, at *7.[7] Judge Valdez made this comment in connection with Claimant's testimony that she needed to bathe three times per a day and apply lotion afterwards, spending a total of "roughly six hours per day putting on lotion." *Id.* Judge Valdez explained that Claimant could bathe and apply lotion before breakfast and in the evening, meaning Claimant would need to apply lotion only once during the middle of the day. *Id.*

Finally, the ALJ discussed how, if Claimant used recommended prescription lotions, she likely could shower and apply lotion less frequently. (R. 316). This conclusion was supported by Dr. Semerdjian's testimony. Dr. Semerdjian testified there are prescription preparations that alleviate dryness and inflammation that causes cracking of the skin. (R. 401). He said, if

---

[6] There is no indication in the record, including in Claimant's testimony, that, while performing these jobs, Claimant was allowed to take multiple long breaks not given to other employees to shower and apply lotion. It strains belief to imagine Claimant received the type and number of breaks that she would have required to shower and apply lotion consistent with her testimony. And Claimant does not assert in her briefs that she took such breaks. Therefore, while Claimant contends that the ALJ relied on speculation to conclude that Claimant was able to perform these jobs without receiving special breaks, the Court finds the ALJ's inference in this regard was reasonable and not contrary to any evidence in the record.

[7] Judge Valdez ultimately held that, because the ALJ did not even mention the lotion issue in the credibility finding, she erred in considering Claimant's testimony. *Moran*, 2013 WL 53893, at *7.

Claimant had appropriate lotions, "this would be significantly less of an issue," (R. 395) and she would not need to shower or, consequently, apply lotion as often as she claimed she needed to do so. (R. 395-396); *see also* (R. 402, 403). Claimant testified she has no income and buys the cheapest lotions she can, (R. 374-375), but she also said she has public aid insurance, (R. 374). It is unclear whether the ALJ concluded public aid insurance would cover the recommended lotions. Therefore, the Court does not rely on this rationale to uphold the ALJ's decision.

It bears emphasizing that, although the ALJ discounted Claimant's testimony about her skin care, the ALJ did not entirely reject it. The ALJ described how Claimant would be permitted to take normal breaks of 15 minutes in the morning and afternoon and of at least 30 minutes for lunch. (R. 395). That means Claimant could not only shower and apply lotion immediately before and after work, but also could apply lotion at least three times during the workday.[8] The ALJ found that these opportunities would be enough for Claimant to take care of her skin and she "would not need unscheduled breaks to apply lotion." (R. 316). The ALJ's decision to discount the most extreme aspects of Claimant's testimony about lotion usage was not patently wrong.

Claimant's last argument is that the ALJ erred when considering several of Claimant's daily activities. This contention has more merit to it. As Claimant notes, the ALJ did not recognize that she received limited assistance on some days with some household chores.[9] And the ALJ did not seem to focus on the fact that Claimant had flexibility in performing her daily activities. With respect to specific activities, the ALJ focused on Claimant's driving, even

---

[8] Claimant testified that, after showering, it would take her ten minutes to apply lotion if she toweled-off completely and up to thirty minutes if she did not. Therefore, it is reasonable to infer that, if her skin were completely dry to start with, it would not take Claimant more than ten minutes to apply lotion.
[9] In a 2008 function report cited by the ALJ, Claimant said that she did not need any help to perform house and yard work. (R. 175). At the hearing, Claimant testified the father of her son helped with household chores four times each week. (R. 380). Claimant did not testify that she received assistance with her other daily activities.

though she only drove two or three times per week to the grocery store or her mother's house. (R. 369). And the ALJ emphasized that Claimant was the sole caretaker of her son but identified limited activities performed to care for him, such as feeding him, bathing him, dressing him, and taking him to the pool or park. (R. 316). This analysis left much to be desired.

The ALJ also identified other daily activities, however, that are more probative of Claimant's physical and mental abilities. The ALJ described how Claimant cared for three pets, cleaned her house, did laundry, made household repairs, mowed the lawn, did yardwork, and went grocery shopping. (R. 314-316). When Claimant went grocery shopping, she drove herself to the store, shopped, and drove herself home, presumably without a break. When doing laundry, Claimant could complete about two loads at a time. (R. 387). When cooking or cleaning, she could work for about half-an-hour until she stopped (not because of physical pain, but, rather because she got "frustrated . . . or distracted or something else"). *Id.* Claimant also testified she was doing aerobics to lose weight. (R. 380).

Taken together, rather than in isolation, these more extensive activities are in tension with some of Claimant's statements. For instance, Claimant said in a function report that, when she used her hands, they "split open," causing so much pain and bleeding that she could not "make a fist." (R. 178); *see also* (R. 315). At the hearing, Claimant said that "50 to 75 percent of the time," her hands are so swollen she "can't bend" and cannot use them. (R. 382). Claimant testified that her feet split open so badly that she cannot even walk "[m]aybe once or twice a week, sometimes more." (R. 379). More generally, Claimant said she only could, at one time, walk a block and a half, stand for half an hour, sit for half an hour, and use her hands for half an hour. (R. 378, 382). In light of this testimony, the Court is not convinced that the ALJ erred in

concluding that Claimant's daily activities, taken as a whole, indicated a greater ability than did her testimony.

Regardless, an ALJ's credibility assessment need not be perfect. *Mueller v. Astrue*, 860 F. Supp. 2d 615, 631 (N.D. Ill. 2012), *aff'd sub nom. Mueller v. Colvin*, 524 F. App'x 282 (7th Cir. 2013) ("In fact, an ALJ's credibility assessment and ultimate determination need not be perfect."). Even if the ALJ erred at points in her assessment of Claimant's daily activities, she still provided other good reasons, consistent with the record, that supported her credibility assessment. In addition to the above discussed bases, the ALJ also explained how Claimant's testimony was not supported by, and at times was contrary to, the medical evidence. Therefore, the Court finds the ALJ's credibility analysis, as a whole, was not patently wrong.

### 4. The ALJ Did Not Err In Relying On The VE's Testimony

Claimant argues substantial evidence does not support the ALJ's step five determination because the VE's testimony, upon which the ALJ relied, conflicted with the Dictionary of Occupational Titles ("DOT"). At the hearing, the ALJ asked the VE what jobs would be consistent with Claimant's RFC. (R. 406-409). The VE initially identified information clerk (DOT 237.367-018), usher (DOT 344.677-014), and hostess (DOT 352.667-010). (R. 407). In response to a question asked by Claimant's attorney, the VE then testified the hostess job could not be performed if Claimant's skin frequently flaked off (a hypothetical condition that was not part of Claimant's RFC). (R. 408). When the ALJ followed-up by inquiring whether there was another job Claimant could perform, the VE identified the position of locker room attendant (DOT 358.677-014). *Id.* Ultimately, the ALJ found Claimant could work as an information clerk, an usher, and a locker room attendant. (R. 321).

Claimant says the VE's testimony conflicted with the DOT. The ALJ limited Claimant's RFC to work that did not involve more than occasional bilateral grasping and fine manipulation with her hands. (R. 314). The VE testified the jobs of information clerk and locker room attendant are consistent with the RFC. But Claimant argues the VE was wrong because both jobs require frequent handling. The Commissioner does not address whether that work requirement is consistent or inconsistent with the RFC.[10]

The Commissioner instead responds by noting Claimant can work as an usher. The VE testified that Claimant's RFC was consistent with the job of usher and that there were 1,000 usher jobs available in the local economy (defined as the Chicago metropolitan region). The ALJ found in her ruling that Claimant could work as an usher. Claimant does not dispute this finding.

The Seventh Circuit has observed, "in the context of step five of our disability benefits analysis, 'it appears well-established that 1,000 jobs' constitutes a significant number." *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (quoting *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009)); *see also Liskowitz*, 559 F.3d at 743 ("As few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number.") (internal citation omitted). District courts in this circuit have listened to the Seventh Circuit and routinely found roughly 1,000 jobs in a region or state is sufficient at step five. *See Dejohnette v. Colvin*, 2015 WL 9315536, at *8 (N.D. Ill. Dec. 23, 2015) (1,296 jobs in the Chicago metropolitan region); *Simcoe v. Colvin*, 2015 WL 3960964, at *5 (S.D. Ind. June 29, 2015) (500 jobs in the region and 32,000 jobs in the nation); *Beatty v. Colvin*, 2015 WL 1143210, at *10 (S.D. Ind. Mar. 12, 2015), *report and recommendation adopted*, 2015 WL 1516378 (S.D. Ind.

---

[10] The Court is not finding that the VE's testimony conflicted with the DOT or that any such conflict was apparent. Because the Commissioner does not address this issue, however, the Court will assume as much.

Mar. 31, 2015) (1,230 jobs in the state and 78,200 jobs in the nation); *Gonzalez v. Colvin*, 2014 WL 4627833, at *8 (N.D. Ill. Sept. 16, 2014) (1,165 jobs in the state); *Schrader v. Colvin*, 2014 WL 4375930, at *4 (C.D. Ill. Sept. 4, 2014) (1,700 jobs in the state); *Valenti v. Colvin*, 2013 WL 6229135, at *13 (N.D. Ind. Dec. 2, 2013) ("And in any event, courts have found that fewer than 800 jobs in the region constituted a significant number of representative jobs at step five."); *Rust v. Colvin*, 2013 WL 3935072, at *20 (N.D. Ind. July 30, 2013) (1,800 jobs in the region); *Forrester v. Astrue*, 2011 WL 4601146, at *7 (N.D. Ind. Sept. 30, 2011) (325 jobs in the region). Therefore, even if the ALJ erred by relying on the VE's testimony regarding the jobs of information clerk and locker room attendant, substantial evidence still would support her decision at step five because of the VE's unchallenged testimony about the job of usher.

There is an additional basis on which this Court's decision could rest. The harmless error doctrine forecloses remand when a court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). To determine whether an error is harmless, a court "look[s] at the evidence in the record to see if [it] can predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). The Commissioner points out that the VE testified someone with Claimant's RFC could work as a hostess and there were 7,200 hostess jobs in the local economy. (R. 407-408). Claimant rightly notes the ALJ did not identify in her ruling the job of hostess as one Claimant could perform. That, however, does not change the fact that, in light of the VE's undisputed testimony that Claimant's RFC is consistent with the job of hostess and this Court's conclusion that the ALJ did not err in determining Claimant's RFC, the Court has great confidence that, on remand, the ALJ would find Claimant could work as a hostess. And there can be no doubt 8,200 jobs in the local economy (combining the usher and hostess positions)

constitutes a significant number. Therefore, even if there were some doubt as to whether the 1,000 usher jobs constituted a significant number, the Court still would not remand the case. *See Harden v. Colvin*, 2014 WL 3866140, at *5 (S.D. Ind. Aug. 6, 2014) (finding a step four error to be harmless because the court could predict with great confidence, based on the VE's testimony, that the ALJ would have found the claimant not disabled at step five).

Claimant argues that, whenever a claimant cannot perform two of the three jobs identified by an ALJ, the district court must remand the case. The one case that Claimant cites, *Herron v. Shalala*, does not support this proposition. 19 F.3d 329 (7th Cir. 1994). In *Herron*, the Seventh Circuit found an ALJ did not "consider . . . evidence relating to [the claimant's] hand impairment," potentially undermining the ALJ's RFC. *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994). The court of appeals said the ignored evidence may be sufficient to prove the claimant actually suffered from the claimed hand impairment. *Id.* Then, in a sentence seemingly meant to explain why the ALJ's error was not harmless, the court of appeals recognized the impairment, if it existed, "would have had significant impact on the disability determination since according to the VE, the only employment available to Herron would then be the security guard position." *Id.* This passing reference, which did not relate to the type of step five error alleged in this case, does not mandate remand. Indeed, in cases that post-date *Herron*, courts have refused to order remand when an ALJ erred at step five by misidentifying all but one job as long as substantial evidence still supported her ultimate step five determination. *See Simcoe*, 2015 WL 3960964, at *5; *Schrader*, 2014 WL 4375930, at *4 (C.D. Ill. Sept. 4, 2014); *Cook v. Astrue*, 800 F. Supp. 2d 897, 910 (N.D. Ill. 2011).

## IV. CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment [ECF No. 19] is denied, and the Commissioner's motion for summary judgment [ECF No. 23] is granted. The decision of the Commissioner is affirmed. This is a final judgment.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: March 20, 2017